Fuld, J.
This appeal presents once more the problem of allocation of stock distributions as between principal and income of a trust under the rule laid down in Matter of Osborne (209 N. Y. 450). For the first time, however, we are faced with the question whether that part of a stock distribution which is supported by a transfer of capital surplus represents a distribution of earnings within the meaning of that rule.
The trust with which we are concerned was established by Oliver H. Payne under an indenture executed in 1915. By its terms, the income was payable to William Bingham, II, for life and, on his death without surviving descendants, the trust was to terminate and the principal distributed to the then living descendants of Mary Payne Bingham, a sister of the settlor of the trust. The life beneficiary died in February of *6 1955 and, since he left no descendants, the surviving children of the settlor’s sister became entitled to the trust corpus.
The trustee brought this proceeding, pursuant to article 79 of the Civil Practice Act, to settle its accounts. The trust had contained 26,500 shares of the stock of the Standard Oil Company of Indiana and 4,100 shares of the stock of Borg-Warner Corporation. During Bingham’s lifetime, each of these companies effected an extraordinary stock distribution, in consequence of which the trust received an additional 26,500 shares from Standard and an additional 8,200 shares from Borg-Warner.[1] The trustee divided' these shares between principal and income of the trust, and it was to the allocations thus made, and the method employed in arriving at them, that Bingham’s executors objected. The Appellate Division approved both method and result and, from its order (which modified Special Term’s determination insofar as it directed a reference), the objectants appeal to us as of right.
We turn, first, to the action taken by the two corporations in effecting the distribution of the additional stock certificates. In each instance, the company transferred to stated capital, or to its capital stock account, its entire capital surplus and sufficient earned surplus to support the additional shares at their par value in the capital stock account. To be more specific, Standard, with 16,229,856 additional shares of $25 par value stock to be issued, transferred $405,746,400[2] to the capital stock account. Of this, $174,612,840 was charged to the capital surplus account, leaving nothing in that account, and the balance of $231,133,560 was charged to the earned surplus account. In terms of percentage, 56.965% of the transfer to the capital stock account came from earned surplus and the balance of 43.035% from capital surplus. Borg-Warner, its stock having a par value of $5, passed a resolution transferring to stated capital 1 ‘ the total amount of capital surplus, including all paid-in surplus ”, and from earned surplus “ the balance necessary to increase the stated capital by an amount equal to $5 times the number by which the issued common shares [were] increased as a result of the reclassification of shares ”. And *7 the company thereafter transferred to the capital stock account from capital surplus the sum of $21,340,734, exhausting that account, and from earned surplus the sum of $4,061,354 to cover, at $5 par, the 5,080,417 additional shares being issued. Again, in terms of percentage, 15.9882% of the transfer to the capital stock account came from earned surplus, the balance of 84.0118% being from capital surplus.
As already indicated, the trustee held 26,500 shares of Standard prior to the 1954 increase in the number of its shares and received certificates representing an additional 26,500 shares; and, having held 4,100 shares of Borg-Warner before that company increased its shares in 1955, the trustee received certificates representing an additional 8,200 shares.
The trust indenture before us makes no provision for the allocation of ‘1 stock dividends ’ nor does it elaborate on the meaning of the words “ rents, issues, profits and income ” in the provision granting such interests to the income beneficiary. Since the indenture was executed in 1915, long before the effective date of section 17-a of the Personal Property Law, the trustee was confronted with the question of whether any of the additional shares of Standard or Borg-Warner represented income of the trust and, if so, how many. It resolved the problem by applying to the shares involved (26,500 shares of Standard and 8,200 shares of Borg-Warner) the percentages in which earned surplus and capital surplus had contributed in each case to the necessary supplementation of the capital stock account, thereby arriving at the number of new shares which it regarded as representing a distribution or division of corporate earnings. And, having then ascertained that awarding such number of shares to income would not impair the “ intact value ” of the trust corpus within the meaning of the Osborne rule,[3] it proceeded to allocate 56.965% or 15,095.73 shares of Standard to income, the balance of 11,404.27 shares to principal, and 15.9882% or 1,311 shares of Borg-Warner to income and the- balance, 6,889 shares, to principal. Objection to the alloca *8 tions which were thus made came from the life beneficiary’s executors; the respondents, representing principal, were satisfied with the trustee’s action and took no appeal from the court determinations which approved it.[4]
The parties have accepted the applicability of the Osborne rule and, in view of that, we are not required to consider whether the rule should be repudiated or restricted, as it, or some counterpart, has been by the courts and legislatures of other jurisdictions which had at one time applied a similar rule. (See, e.g., 3 Scott, Trusts [2d ed., 1956], § 236.3, pp. 1816-1817; Restatement, Trusts [Supp. 1948], § 236; Bowles v. Stilley’s Ex’r., 267 S. W. 2d 707 [Ky.]; Langdell v. Dodge, 100 N. H. 118; Cunningham Estate, 395 Pa. 1; see, also, Matter of Lindsay, 11 Misc 2d 374.) Our sole task is to determine whether the Osborne rule, fairly applied, required the trustee to allocate to the income beneficiary more stock than it had. '
The appellants claim, in effect, that, because some earnings were transferred to the capital stock account in each case, the entire accompanying increase in the number of shares represents a distribution or division of earnings to which the income beneficiary became entitled, except to the extent that it might reduce the “ intact value ” of the trust’s investment in particular shares. It is their submission that the income beneficiary is entitled to all earnings accumulated by the corporation since the trustee acquired the stock. And, although they must concede that, until the corporation effects a distribution of its earnings, the income beneficiary cannot obtain them, they contend that any distribution to its stockholders of cash or shares of the company’s own stock represents such a distribution of the corporate earnings. Their only concession to principal is that the trust’s “ intact value ” may not he impaired. The source of the distribution is deemed immaterial on the ground that principal is to be assured its ‘[1] intact value ’ ’; everything in excess of that, when issued by the company to its stockholders, is for the income beneficiary.
*9 This is certainly not the rule of the Osborne case; indeed, it is a perversion of the “ intact value ” principle. Matter of Osborne and the decisions which followed it make it crystal clear that such “intact value” was intended as a minimum figure below which the corpus of the trust could not be reduced, not as a jumping-off place above which income could claim everything. The ‘ ‘ intact value ’ ’ principle was, in other words, designed as a safeguard of the rights of principal and a limitation on the rights of income, not, as the appellants would have it, as a limitation on the rights of principal.
The appellants’ suggestion that, by virtue of Osborne, an income beneficiary has such a claim upon corporate earnings that he can demand all corporate distributions, whatever their nature and whatever their source, until that claim has been made good, not only is unsupported by precedent, but is thoroughly unsound. In point of fact, the nature of each distribution is important and its source of particular significance. For example, an extraordinary dividend in property acquired by a corporation prior to the acquisition of its stock by a trust — or out of earnings accumulated prior thereto — is trust principal, even though the company may have accumulated earnings well in excess of the value of the dividend since that time. (See United States Trust Co. v. Heye, 224 N. Y. 242; Macy v. Ladd, 227 NN. Y. 670.) The distribution by the corporation of something which can be identified as capital may not be treated as a distribution of earnings, despite the fact that there have been earnings of equivalent or greater value accumulated during the life of the trust. This completely invalidates the appellants’ theory that all distributions which leave trust principal “ intact ” — i.e., which do not exceed corporate earnings realized after the acquisition of the stock by the trust — go to income. It makes clear the necessity for looking to the source of the “dividend” and determining whether that which is being distributed was, in fact, earned by the company since the trust acquired the stock and still retains its status as earnings. Obviously, we cannot trace specific dollars of earnings or of capital as they are received and disbursed, but that does not justify our treating all corporate distributions as distributions of earnings. If the appellants were correct and an income beneficiary were to be held entitled to anything issued by the corpora *10 tion in excess of the “intact value ”, then, such a beneficiary would have to be given stock rights, identifiable capital assets whenever distributed and even shares issued in connection with what everyone would concede to be a stock split (in which no segregation of earnings or alteration of surplus accounts has taken place). None of these have we been willing to do (see, e.g., Matter of Hagen, 262 N. Y. 301, 306; Bourne v. Bourne, 240 N. Y. 172, 175-176; United States Trust Co. v. Heye, 224 N. Y. 242, supra, Baker v. Thompson, 224 N. Y. 592), nor should we be.
The rule which assigns to the income beneficiary stock issued against the capitalization of earnings is based on the proposition that the stock dividend is, in effect, a distribution of such earnings even though they are actually being retained in the business. (See Equitable Trust Co. v. Prentice, 250 N. Y. 1, 8, 12.) In reality, as the court observed in the Prentice case, “‘A stock dividend does not distribute property, but simply dilutes the shares as they existed before ’ ” (250 N. Y., at p. 12). The rule as applied has proved to be generous to the average income beneficiary since it has made no attempt to equate the true value of the stock to be received by him with the amount of earnings capitalized and, in addition, has ignored the fact that through receipt of the stock he obtains a proportionate interest not only in any remaining undistributed earnings and in corporate capital assets of every kind, but also in all earnings in the future.
Nor may we overlook the fact that, to the extent that the source of any stock dividend is capital surplus, there is no significant possibility of injury to the life tenant if the stock is retained as part of the corpus. A substantial part or, indeed, all of the capital surplus may never have represented earnings of the enterprise. A common instance is the so-called ‘ ‘ paid-in surplus ”, representing the difference between the par value or stated value of shares issued by the corporation and the actual consideration received by it for such shares. The Borg-Warner resolution which declared the stock dividend expressly referred to paid-in surplus as comprising part of the capital surplus to be transferred to capital for the issuance of the new shares. If the entire paid-in capital had been added to the statutory capital in the first instance, no one would even have suggested that the income beneficiary could assert any right to *11 it. The circumstance that the same result is achieved in two steps can make no difference.
It is true that some capital surplus may have had its origin in what were once earnings. Frequently, capital surplus is created through the use of earnings to support ordinary stock dividends which the income beneficiary will already have received. A rule of the New York Stock Exchange, required and enforced by the Securities and Exchange Commission, demands that, when a stock dividend is declared, the earned surplus account of the corporation must be charged with the market value of the stock to be distributed, not merely its par or stated value. (See N. Y. Stock Exchange — Company Manual, § A-13; Rappaport, SEC Accounting Practice and Procedure [1956], p. 312.)[5] Since, ordinarily, only par or stated value goes into the capital stock account, the excess of market value over par or stated value is transferred to capital surplus. The income beneficiary receives the shares thus capitalized. If capital surplus thus derived is subsequently transferred to the capital stock account to support a further issuance of stock, the award of any such stock to income would actually represent a double distribution to the income beneficiary of the identical earnings! Consequently, even if capital surplus is in part made up out of earnings capitalized in years gone by, it is generally accepted that the further transfer of such earnings from capital surplus to the capital stock account does not constitute such a capitalization of earnings as will call the Osborne rule into play. (Cf. Matter of Lissberger, 189 Misc. 277, affd. 273 App. Div. 881, motion for leave to appeal denied 298 N. Y. 934; Matter of Hagen, 262 N. Y. 301, 304, supra.)
Accepting, as we do, the prevailing view that a transfer from capital surplus to the capital stock account does not constitute a capitalization or distribution of earnings when that transfer represents 100% of the capitalization accompanying a stock distribution, it necessarily follows that we may not treat such a transfer as a capitalization of earnings simply because, as in the present case, it represents less than 100%.
To recapitulate. In Matter of Osborne (209 N. Y. 450, supra) and the cases preceding it, we adopted the fiction that the capi *12 talization of accumulated earnings, when accompanied by the simultaneous issue of stock, is equivalent to the distribution of those earnings in the form of that stock. But even in Osborne we recognized the inequitable results which might stem from this artificial practice if unchecked (209 N. Y., at p. 475). However, instead of questioning the validity of the basic assumption that the entire new issue of stock in such cases represented a distribution of earnings, we devised the “ intact value ” principle as a sort of safety valve. Its efficacy, though, has become more and more questionable as economic conditions and corporate practices have changed. (See Tenney, Stock Splits, The Trustee’s Dilemma, Proceedings of Banking Law Section, N. Y. State Bar Assn., Jan. 29, 1959; Browning, Extraordinary Corporate Distributions under the New York Law of Trusts, 4 Syracuse L. Rev. 293.)
This does not mean that we need now decide whether an entirely new approach to the problem of corporate stock distributions is called for or whether the rules which we have followed are wrong and should be modified. As our discussion has made manifest, what the appellants contend for is an extension, rather than merely an application, of the Osborne' rule — a rule which already has been recognized as too favorable to the income beneficiary and has been repudiated by the Legislature of this State as to trusts created after 1926 (Personal Property Law, § 17-a) as well as by the legislatures and courts of many other jurisdictions that originally had adopted it. (See authorities cited, p. 8.)
In each of the instances here under consideration, there has been a partial capitalization out of earned surplus, which concededly represents a capitalization of earnings. A significant part of the total capitalization, however, has come from capital surplus, and it is impossible to identify this as earnings. Under the circumstances, it is our firm conclusion that the income beneficiary has been awarded the very maximum number of shares which he could possibly claim under any supportable theory and is entitled to no more of the stock than the trustee has apportioned to him. What has been done is consistent with our practice of arbitrarily identifying with those earnings which are capitalized in conjunction with a stock distribution all new shares that are supported by those earnings. With respect to *13 the shares here involved, only 15.9882% of the Borg-Warner shares can possibly be identified with earnings not previously capitalized, and only 56.965% of the shares of Standard. The remaining shares can only be identified with ‘ ‘ capital surplus ’ ’ which would not by itself support an award of new shares to trust income even if it could be traced to undistributed earnings. These remaining shares, at least, belong to trust principal, and, since no basis has been shown for eliminating any items on the books of the corporations appearing in the capital surplus accounts (cf. Bourne v. Bourne, 240 N. Y. 172, 177, supra), the Appellate Division properly upheld the trustee’s allocations.
The order should be affirmed, with costs to all parties appearing separately and filing separate briefs, payable out of the estate.

. Standard issued one additional share for every share of its capital stock outstanding — referred to as “a stock dividend of 100%” — and Borg-Warner issued two additional shares of its stock for each of its outstanding shares.

. Some references in record indicate this figure was $405,746,409.

. Application of the “ intact value ” principle, the court wrote in Matter of Osborne, simply requires that, “in all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the corpus of the trust to maintain that corpus unimpaired and the remainder thereof must be awarded to the life beneficiary ” (209 N. Y., at pp. 484-485).

. By their acceptance of the trustee’s allocation to income of 15,095.73 shares of Standard and of 1,311 shares of Borg-Wamer, the respondents have confined the issue before us to whether the trustee has allocated too little to income or, conversely, too much to principal; the possibility that the trustee may have assigned too much to income and too little to principal is not in issue.

. Where the dividend exceeds 25%, the Stock Exchange rule treats the distribution as a stock split rather than a stock dividend.